1
2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

3

IN RE: NINE WEST LBO SECURITIES
LITIGATION

No. 20-MD-2941 (JSR)

4

5
6
7
8

WILMINGTON SAVINGS FUND
SOCIETY, FSB, as successor indenture
trustee for the 6.875% Senior Notes due
2019, the 8.25% Senior Notes due 2019,
and the 6.125% Senior Notes due 2034 of
Nine West Holdings, Inc.,

No. 20-cv-4569 (JSR)

**FIRST AMENDED COMPLAINT**

[Constructive and Intentional Fraudulent
Conveyance]

9

Plaintiff,

10

-against-

**JURY TRIAL DEMANDED**

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

RICHARD L. DICKSON, ROBERT L.
METTLER, ROBERT & SUSAN
METTLER FAMILY TRUST U/A
3/27/06, ROBERT L. METTLER,
SUSAN T. METTLER, TRUSTEES,
BAM ADVISOR SERVICES d/b/a
LORING WARD, BLUE CROSS OF
CALIFORNIA, CALIFORNIA
PHYSICIANS' SERVICE d/b/a BLUE
SHIELD OF CALIFORNIA,
DIVERSIFIED ALPHA GROUP
TRUST, NICOLA GUARNA, HAWAII
DE LLC, GEORGE M. KLABIN,
LITMAN GREGORY MASTERS
ALTERNATIVE STRATEGIES FUND,
PACIFIC SELECT FUND – PD SMALL-
CAP VALUE INDEX PORTFOLIO,
PACIFIC SELECT FUND – SMALL-
CAP EQUITY PORTFOLIO, PACIFIC
SELECT FUND – SMALL-CAP INDEX
PORTFOLIO, PG&E CO. NUCLEAR
FACILITIES QUALIFIED CPUC
DECOMMISSIONING MASTER
TRUST, RESEARCH AFFILIATES
EQUITY US LARGE, L.P. f/k/a
ENHANCED RAFI US LARGE LP,
ROBERT RODRIGUEZ, and SA U.S.
SMALL COMPANY FUND,

Defendants.

27
28

FIRST AMENDED COMPLAINT

3528605.1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

NATURE OF THE ACTION ..................................................... 1

JURISDICTION AND VENUE ................................................. 4

PARTIES............................................................................... 4

BACKGROUND ON JONES GROUP AND THE 2014
TRANSACTION.................................................................... 13

    A.    The Poor Performance of Jones Group in Advance of the
2014 Transaction.......................................................... 13

    B.    Jones Group Directors and Officers Struggle to Find an
Exit Strategy ................................................................ 14

    C.    Jones Group Directors and Officers, and Sycamore, Plan a
Transaction That Will Benefit Them at the Expense of
NWHI and Its Creditors................................................. 17

    D.    Jones Group Directors and Officers Allow Sycamore to
Reverse-Engineer Its Valuations to Arrive at Desired
Valuation Splits between RemainCo and the Carve-Out
Businesses..................................................................... 20

    E.    Jones Group Management and Sycamore Exaggerate
RemainCo's Estimated 2013 EBITDA............................. 22

    F.    Jones Group Directors and Officers Stand by as Sycamore
Prepares Forecasts Inconsistent with Jones Group's
Performance .................................................................. 24

    G.    Jones Group's Directors and Officers Fail to Protect the
Company When Sycamore Substitutes More Debt for
Equity ........................................................................... 30

    H.    Sycamore Withholds Its Lower "Base Case" Projections
from Duff & Phelps, and Duff & Phelps Uses Sycamore's
Manipulated "Upside" Projections in Its Solvency Opinion............. 34

    I.    A Realistic Analysis Would Have Shown That the 2014
Transaction Would Render NWHI Insolvent ..................... 37

    J.    The 2014 Transaction Closes........................................... 38

    K.    RemainCo's Disastrous Post-LBO Performance
Corroborates the Contemporaneous Evidence That
Sycamore's Projections Were Unrealistic and Unreliable ............. 41

    L.    Sycamore Takes Dividends from the Carve-Out Businesses
Shortly After Closing and Then Resells the Carve-Out
Businesses to Third Parties at Massive Profits.................... 44

FIRST AMENDED COMPLAINT

1

M.     Insolvent NWHI Sinks into Bankruptcy................................................ 45

CLAIM I  Avoidance and Recovery of the Shareholder Transfers as
     Constructive Fraudulent Conveyances (Against the Shareholder
     Defendants) .................................................................................................. 46

CLAIM II  Avoidance and Recovery of the Shareholder Transfers as
     Intentional Fraudulent Conveyances (Against the Shareholder
     Defendants) .................................................................................................. 47

CLAIM III  Avoidance and Recovery of the Change in Control Payments
     as Constructive and Intentional Fraudulent Conveyances
     (Against Dickson) ........................................................................................ 49

PRAYER FOR RELIEF........................................................................................ 50

JURY TRIAL DEMAND ...................................................................................... 51

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

.

3528605.1

FIRST AMENDED COMPLAINT

Plaintiff Wilmington Savings Fund Society, FSB, as successor indenture trustee (the "Indenture Trustee") for the 6.875% Senior Notes due 2019, the 8.25% Senior Notes due 2019, and the 6.125% Senior Notes due 2034 of Nine West Holdings, Inc., alleges, upon knowledge as to the Indenture Trustee and upon information and belief (based on review of documents, deposition testimony, and other materials produced in the Nine West Holdings, Inc. bankruptcy case and additional investigation by the Indenture Trustee's counsel) as to all other matters:

## NATURE OF THE ACTION

1.    On April 8, 2014, the fashion company The Jones Group Inc. ("Jones Group," or the "Company") consummated a series of transactions that rendered it insolvent.  These transactions (collectively, the "2014 Transaction") significantly increased the Company's debt, significantly decreased its assets, distributed more than $1 billion to its shareholders, and rewarded its directors and officers with change-of-control payments and other substantial consideration—all to the detriment of the Company and its creditors.

2.    In the 2014 Transaction, Jones Group:

- merged with a shell company that was an affiliate of private equity sponsor Sycamore Partners Management, L.P. (together with its principals and certain affiliates, "Sycamore");

- sold off its "crown jewel" business units to other affiliates of Sycamore for a fraction of their value;

- saddled the much-diminished remaining company, renamed Nine West Holdings, Inc. ("NWHI"), with more than $1.5 billion in debt—composed of $528 million of new debt in addition to a pre-existing debt balance of $1,022 million—which could not be repaid; and

- distributed approximately $1.2 billion to its shareholders.

FIRST AMENDED COMPLAINT

3528605.1

1    3.    A simplified diagram of the 2014 Transaction is set forth below.



4.    The 2014 Transaction was a single integrated transaction; all key aspects closed on April 8, 2014.  As the Jones Group directors and officers knew, the payments to the Jones Group shareholders, directors, and officers could not have occurred independently of all the other aspects of the 2014 Transaction, including the incurrence of the additional debt and the self-dealing asset sales to affiliates of Sycamore, all of which the Jones Group directors and officers helped to implement. These directors and officers closed their eyes to the fact that the 2014 Transaction would leave NWHI insolvent, inadequately capitalized, and unable to pay its debts.

5.    The 2014 Transaction enriched everyone involved except the Company and its creditors.  By the end of the 2014 Transaction, Sycamore had reduced the amount of equity it would invest to acquire NWHI from $395 million to only $120

FIRST AMENDED COMPLAINT

3528605.1

million, increased the debt load beyond that which was originally contemplated, and stripped away NWHI's crown jewel assets at less than fair value and free from any pre-existing Jones Group debt, all while NWHI's financial performance deteriorated. Within a short period of time after the closing of the 2014 Transaction, Sycamore generated a profit of approximately half a billion dollars from receipt of dividends and sale of these assets.  Jones Group's directors, officers, and shareholders collectively had walked away with almost $1.2 billion.  By contrast, NWHI was deprived of its prize assets and left with shrinking, low-profit businesses and a huge debt load.

6.      The Jones Group directors and officers breached their fiduciary duties to the Company in advocating for and approving the merger (the "Merger") that was a key step in the 2014 Transaction, in not reassessing the Merger when Sycamore dramatically decreased its equity commitment and simultaneously substantially increased the Company's debt despite ongoing business deterioration, and in advocating for and helping to implement the other aspects of the 2014 Transaction, including selling off valuable assets of the Company at less than fair market value, distributing more than $1 billion to the shareholders, and paying large sums to themselves.

7.      NWHI ultimately filed for bankruptcy on April 6, 2018 in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), inflicting hundreds of millions of dollars of losses on its unsecured creditors.

8.      In this action, the Indenture Trustee seeks to recover the cash distributed to Jones Group shareholders as a fraudulent conveyance.  These claims seek to vindicate the fundamental principle of law that the shareholders of a corporation, as its owners, assume the primary risk of the corporation's failure, and thus when the corporation becomes insolvent, the shareholders should be paid only *after* the corporation's creditors are paid, not before, as was the case here.

9.      When the Jones Group directors approved the Merger, and thereafter through the closing, they consciously disregarded their ongoing obligation to

FIRST AMENDED COMPLAINT

3528605.1

determine whether the 2014 Transaction was and remained in the best interests of Jones Group. Their duty to act in the corporation's best interests—which they failed to do—included protecting Jones Group from transferring corporate assets and incurring corporate obligations when Jones Group would not receive reasonably equivalent value in exchange and would be rendered insolvent. In implementing the 2014 Transaction, the Jones Group directors and officers were acting in a manner that was contrary to the best interests of the corporation, destructive of the rights and interests of the corporation's creditors, and in their own personal financial interests.

## JURISDICTION AND VENUE

10. The United States District Court for the Central District of California (the "Court") has jurisdiction over this proceeding under 28 U.S.C. § 1334 as it arises under title 11 or arises in or is related to a case under title 11 of the United States Code (the "Bankruptcy Code").

11. This Court has personal jurisdiction over the defendants as each resides in or has its principal place of business in California.

12. Venue in this District is proper under 28 U.S.C. § 1391(b)(1) because all defendants are residents of the State in which this District is located and one or more defendants reside in this District.

## PARTIES

13. Plaintiff Wilmington Savings Fund Society, FSB, is the successor indenture trustee under

    a.   that certain indenture (as amended, restated, supplemented, or otherwise modified from time to time), dated as of March 7, 2011, among The Jones Group Inc., Jones Apparel Group Holdings, Inc., Jones Apparel Group USA, Inc., and JAG Footwear, Accessories and Retail Corporation, as issuers, and Wilmington Savings Fund Society, FSB as successor trustee to U.S. Bank National Association, for the 6.875% Senior Notes due 2019 (the "Old 2019 Notes");

FIRST AMENDED COMPLAINT

3528605.1

b.     that certain indenture (as amended, restated, supplemented, or otherwise modified from time to time), dated as of April 23, 2014, between NWHI, as issuer, and Wilmington Savings Fund Society, FSB as successor trustee to U.S. Bank National Association, for the 8.25% Senior Notes due 2019 (the "New 2019 Notes"); and

c.     that certain indenture (as amended, restated, supplemented, or otherwise modified from time to time), dated as of November 22, 2004, among Jones Apparel Group, Inc. (now known as NWHI), Jones Apparel Group Holdings, Inc., Jones Apparel Group USA, Inc., Nine West Footwear Corporation, and Jones Retail Corporation, as issuers, and Wilmington Savings Fund Society, FSB as successor trustee to U.S. Bank National Association and SunTrust Bank, for the 6.125% Senior Notes due 2034 (the "2034 Notes").

14.     Under the Debtors' Third Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code (the "Plan") of NWHI and its debtor affiliates, the NWHI Litigation Trust, also known as the Non-Released Party Trust, is authorized to pursue, on behalf of the NWHI debtors or their estates, all claims and causes of action arising under state or federal law in respect of matters arising out of or relating to the 2014 Transaction against (a) any person or entity that received consideration, directly or indirectly, in exchange for common stock of Jones Group in connection with the 2014 Transaction and any of their management companies, fund advisors, affiliates, assignees, participants, or mediate, immediate, or subsequent transferees; (b) directors, officers, or managers of Jones Group and its subsidiaries and affiliates; and (c) the financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals for Jones Group (collectively, the "Non-Released Party Trust Causes of Action").

15.     In addition, subsection (f) of Article IV.L of the Plan authorizes the Indenture Trustee

FIRST AMENDED COMPLAINT

3528605.1

to pursue avoidance, recovery, or similar remedies that may be brought under chapter 5 of the Bankruptcy Code or under similar or related state or federal statutes or common law, including fraudulent transfer law, solely to the extent necessary to pursue such claims against any Person or Entity that received consideration, directly or indirectly, in exchange for common stock of The Jones Group Inc. in connection with the 2014 Transaction and any of their management companies, fund advisors, Affiliates, assignees, participants, or mediate, immediate, or subsequent transferees . . . .

16. Paragraph 12 of the February 27, 2019 order (the "Confirmation Order") confirming the Plan provides:

Nothing in the Plan or this Confirmation Order shall preclude . . . the simultaneous assertion of the Non-Released Party Trust Causes of Action and any of the Causes of Action described in [subsection (f) of Article IV.L of the Plan], in joint or separate actions, whenever commenced, by one or more of the Non-Released Party Trust, the Indenture Trustees, or creditors of the Debtors that received and retained Non-Released Party Trust Interests; *provided* that such assertion by the Indenture Trustees or creditors may only be made after receiving written approval of the Non-Released Party Trustee (which may only be granted if, among other things, the Non-Released Party Trustee receives unanimous written authorization from the Non-Released Party Trust Advisory Board with due consideration of the best interests of all beneficiaries of the Non-Released Party Trust); *provided, further*, that no defendant that is the subject of the Non-Released Party Trust Causes of Action and the Causes of Action described in [subsection (f) of Article IV.L of the Plan] shall be required to disgorge the same transfer more than once.

17. The Non-Released Party Trust Advisory Board gave its unanimous written authorization, and the Non-Released Party Trustee gave his written approval, of this action as of January 9, 2020, and the Bankruptcy Court lifted the automatic stay with respect to this action effective January 31, 2020.

18. In separate actions in this District, the Non-Released Party Trustee and the Indenture Trustee are seeking to recover the same shareholder transfers from certain of the same recipients of those transfers because certain defenses that might be

FIRST AMENDED COMPLAINT

3528605.1

asserted as against the Non-Released Party Trustee are not applicable to the Indenture Trustee, and vice versa.  As provided in the Confirmation Order, no defendant that is subject to suit by both the Non-Released Party Trustee and the Indenture Trustee shall be required to disgorge the same transfer more than once.

19.     Each of the persons named in paragraphs 20-30 (the "Directors") served as a member of Jones Group's Board of Directors (the "Board") and voted to approve the Merger on December 19, 2013 and to recommend it to Jones Group's shareholders for their approval.  Each of the Directors advocated for and facilitated not only the Merger, but the other aspects of the 2014 Transaction, while knowing that, or recklessly disregarding whether, the 2014 Transaction would leave NWHI insolvent, inadequately capitalized, and unable to pay its debts.

20.     Nonparty Wesley R. Card served as Jones Group's Chief Executive Officer and as a director of Jones Group.[1]

21.     Nonparty Gerald C. Crotty was a director of Jones Group.

22.     Nonparty John D. Demsey was a director of Jones Group.

23.     Nonparty Mary Margaret Hastings Georgiadis was a director of Jones Group.  In addition to holding shares in Jones Group directly, Georgiadis held shares through Telendos, LLC.

24.     Nonparty Matthew H. Kamens was a director of Jones Group.

25.     Nonparty Sidney Kimmel was Chairman of the Board of Directors of Jones Group.  In addition to holding shares in Jones Group directly, Kimmel held shares through The Sidney Kimmel Revocable Indenture of Trust.

26.     Defendant Robert L. Mettler was a director of Jones Group and served as its Presiding Independent Director.  In addition to holding shares in Jones Group directly, Mettler held shares through defendant Robert & Susan Mettler Family Trust

---

[1] Card and the other nonparty directors and officers of Jones Group listed in paragraphs 20-37 have been named as defendants in other actions that are before this Court for consolidated pretrial proceedings.

7

FIRST AMENDED COMPLAINT

3528605.1

1    U/A 3/27/06, Robert L. Mettler, Susan T. Mettler, Trustees.

2       27.    Nonparty James A. Mitarotonda was a director of Jones Group.  He

3 joined the Board in June 2013.  In addition to holding shares in Jones Group directly,

4 Mitarotonda held shares through Barington Companies Equity Partners, L.P. and

5 Barington Companies Investors, LLC (collectively, "Barington").

6       28.    Nonparty Jeffrey Nuechterlein was a director of Jones Group.

7       29.    Nonparty Lowell W. Robinson was a director of Jones Group.

8       30.    Nonparty Ann Marie C. Wilkins was a director of Jones Group.

9       31.    Card and each of the persons named in paragraphs 32-37 (collectively,

10 the "Officers") advocated for and facilitated not only the Merger, but the other aspects

11 of the 2014 Transaction, while knowing that, or recklessly disregarding whether, the

12 2014 Transaction would leave NWHI insolvent, inadequately capitalized, and unable

13 to pay its debts.

14       32.    Nonparty Christopher R. Cade served as Executive Vice President, Chief

15 Accounting Officer, and Controller of Jones Group.

16       33.    Nonparty Ira M. Dansky served as Executive Vice President, General

17 Counsel, and Secretary of Jones Group.  In addition to holding shares in Jones Group

18 directly, Dansky held shares through Ira Martin Dansky Revocable Trust.

19       34.    Defendant Richard L. Dickson served as President and Chief Executive

20 Officer – Branded Businesses of Jones Group.

21       35.    Nonparty Joseph T. Donnalley served as Jones Group's Treasurer and

22 Executive Vice President, Corporate Tax and Risk Management.

23       36.    Nonparty Tami Fersko served as Jones Group's Executive Vice

24 President, Financial Operations.

25       37.    Nonparty John T. McClain served as Jones Group's Chief Financial

26 Officer.

27       38.    The Directors and Officers had interests in the 2014 Transaction that

28 were different from and in addition to those of Jones Group's shareholders generally,

FIRST AMENDED COMPLAINT

3528605.1

and different from those of Jones Group's creditors.  In particular, the 2014 Transaction triggered (a) acceleration of the vesting of Restricted Shares and/or Share Equivalent Units held by each of the Directors and Officers and the cancellation and conversion of those shares into the right to receive $15 per share in cash; (b) acceleration of the award of Restricted Shares to the Officers and/or the Directors under Jones Group's Long Term Incentive Plan at a level assuming maximum achievement of all applicable performance goals, and the cancellation and conversion of those shares into the right to receive $15 per share in cash; (c) the receipt of payments and benefits under the Officers' employment agreements upon termination of their employment, including a lump-sum payment equal to three to six times each Officer's annual base salary; and (d) entitlement to indemnification benefits.

39.     Accordingly, each of the Directors and Officers had a substantial monetary incentive to approve and/or facilitate the 2014 Transaction.  First, all the Directors and Officers knew that they would receive, individually or through family members, affiliated entities, or trusts, material amounts from the cancellation of Jones Group shares in connection with the LBO.  Second, all the Officers (except for Cade) knew they would or could receive material amounts in additional compensation through "Change in Control Payments" if the 2014 Transaction was consummated. The breakdown of the more than $79 million the Directors and Officers received in connection with the 2014 Transaction was as follows:

FIRST AMENDED COMPLAINT

3528605.1

| Name | Amount Received from Common Shares Cancelled in LBO | Amount Received from Restricted Shares Cancelled in LBO (and Accumulated Dividends) | Additional Compensation Triggered by 2014 Transaction | Totals |
|---|---|---|---|---|
| *Directors* | | | | |
| Card (also CEO) | $4,978,620 | $11,873,292 | $9,957,775 | $26,809,687 |
| Crotty | 1,150,830 | 434,093 | | 1,584,923 |
| Demsey | 273,885 | 204,690 | | 478,575 |
| Georgiadis | 1,003,830 | 239,020 | | 1,242,850 |
| Kamens | 925,830 | 139,020 | | 1,064,850 |
| Kimmel | 125,805 | 139,020 | | 264,825 |
| Mettler | 1,003,830 | 139,020 | | 1,142,850 |
| Mitarotonda | 4,089,570 | 154,845 | | 4,244,415 |
| Neuchterlein | 348,885 | 204,690 | | 553,575 |
| Robinson | 114,330 | 139,020 | | 253,350 |
| Wilkins | 307,905 | 204,690 | | 512,595 |
| *Officers* | | | | |
| Cade | | 820,301 | 1,236,000 | 2,056,301 |
| Dansky | 1,013,340 | 2,077,821 | 4,369,282 | 7,460,443 |
| Dickson | 2,216,445 | 9,221,607 | 6,868,904 | 18,306,956 |
| Donnalley | | 517,289 | 1,080,000 | 1,597,289 |
| Fersko | 408,060 | 1,243,912 | 1,404,000 | 3,055,972 |
| McClain | 2,213,970 | 2,894,119 | 4,048,185 | 9,156,274 |
| **Totals** | **$20,175,135** | **$30,646,449** | **$28,964,146** | **$79,785,730** |

40.     The defendants (the "Shareholder Defendants") are among those who received transfers (the "Shareholder Transfers") in connection with the cancellation of Jones Group stock (including Common Shares, Restricted Shares, Share Equivalent Units, and accumulated unpaid dividends on Restricted Shares) as a result of the LBO.  The Shareholder Defendants received at least the Shareholder Transfers shown in the table below.

FIRST AMENDED COMPLAINT

3528605.1

| Defendant | Residence or Principal Place of Business | Common Shares Cancelled in LBO | Restricted Shares and/or Share Equivalent Units | Accumu-lated Unpaid Dividends on Restricted Shares | Total Shareholder Transfers |
|---|---|---|---|---|---|
| Richard L. Dickson | Pacific Palisades, CA | $2,216,445.00 | $9,070,965.00 | $150,642.40 | **$11,438,052.40** |
| Robert L. Mettler, Robert & Susan Mettler Family Trust U/A 3/27/06, Robert L. Mettler, Susan T. Mettler, Trustees | Studio City, CA | 1,003,830.00 | 139,020.00 | | **1,142,850.00** |
| BAM Advisor Services d/b/a Loring Ward | San Jose, CA | 186,195.00 | | | **186,195.00** |
| Blue Cross of California | Thousand Oaks, CA | 210,690.00 | | | **210,690.00** |
| California Physicians' Service d/b/a Blue Shield of California (previously named herein as Blue Shield of California) | San Francisco, CA | 351,420.00 | | | **351,420.00** |
| Diversified Alpha Group Trust | San Francisco, CA | 840,705.00 | | | **840,705.00** |
| Nicola Guarna | Los Angeles, CA | | 375,000.00 | | **375,000.00** |
| Hawaii DE LLC | Palo Alto, CA | 101,055.00 | | | **101,055.00** |
| George M. Klabin | Beverly Hills, CA | 210,000.00 | | | **210,000.00** |
| Litman Gregory Masters Alternative Strategies Fund | Walnut Creek, CA | 953,250.00 | | | **953,250.00** |
| Pacific Select Fund – PD Small-Cap Value Index Portfolio | Newport Beach, CA | 152,085.00 | | | **152,085.00** |

11

FIRST AMENDED COMPLAINT

3528605.1

| Defendant | Residence or Principal Place of Business | Common Shares Cancelled in LBO | Restricted Shares and/or Share Equivalent Units | Accumu-lated Unpaid Dividends on Restricted Shares | Total Shareholder Transfers |
|---|---|---|---|---|---|
| Pacific Select Fund – Small-Cap Equity Portfolio | Newport Beach, CA | 662,925.00 | | | **662,925.00** |
| Pacific Select Fund – Small-Cap Index Portfolio | Newport Beach, CA | 1,860,991.28 | | | **1,860,991.28** |
| PG&E Co. Nuclear Facilities Qualified CPUC Decommissioning Master Trust | San Francisco, CA | 172,500.00 | | | **172,500.00** |
| Research Affiliates Equity US Large, L.P. f/k/a Enhanced RAFI US Large LP | Newport Beach, CA | 198,750.00 | | | **198,750.00** |
| Robert Rodriguez | Los Angeles, CA | | 375,000.00 | | **375,000.00** |
| SA U.S. Small Company Fund | San Jose, CA | 186,195.00 | | | **186,195.00** |

41.     Nonparty Stefan Kaluzny is a co-founder and managing director of Sycamore and executed the Merger Agreement on behalf of the Sycamore-affiliated parties to the Merger Agreement.  As discussed in more detail below, Kaluzny also executed the purchase agreements that allowed Sycamore—with the assistance of Jones Group's officers and directors—to sell to its affiliates several of Jones Group's most valuable businesses for a fraction of their true value.  Upon the closing of the 2014 Transaction, Kaluzny became one of the two directors of NWHI and held that position until his resignation in September 2018.

42.     Nonparty Peter Morrow is a co-founder and managing director of Sycamore.  He executed the same purchase agreements as Kaluzny, with Kaluzny representing the Sycamore-affiliated seller, and Morrow representing the Sycamore-affiliated buyers.  Like Kaluzny, upon the closing of the 2014 Transaction, Morrow

FIRST AMENDED COMPLAINT

3528605.1

became one of the two directors of NWHI and held that position until his resignation in September 2018.

43.     At all times relevant to this complaint, Jones Group, which was incorporated in Pennsylvania, and NWHI, which was incorporated in Delaware, had their principal executive office, principal corporate office, and principal place of business at 1411 Broadway, New York, New York, and thus resided in New York.

## BACKGROUND ON JONES GROUP AND THE 2014 TRANSACTION

**A.     The Poor Performance of Jones Group in Advance of the 2014 Transaction**

44.     Prior to the 2014 Transaction, Jones Group had been a publicly-traded company predominantly focused on a wholesale footwear and apparel business selling such brands as Nine West, Anne Klein, and Gloria Vanderbilt to retailers like Macy's, Lord & Taylor, and Walmart/Sam's Club.  Mid-tier footwear and apparel businesses like Jones Group faced a challenging economic environment in 2012 and 2013. Analysts predicted that these challenges would continue into 2014 and, in fact, the performance of mid-tier footwear and apparel retailers continued to trend downwards during 2014.

45.     In the years and months leading up to the 2014 Transaction, Jones Group performed poorly, repeatedly missing its own forecasts and budgets.  While the Company projected annual growth of between 4% and 6% from 2011 to 2013, revenue in those years was flat, and Jones Group missed its internal earnings per share targets by 33% in 2011, 9% in 2012, and 25% in 2013.  Retail operations were faltering during that time period, with the net store count decreasing by 199 stores, a 39% reduction.

46.     Jones Group's EBITDA (earnings before interest, taxes, depreciation, and amortization) fell from $340 million in 2010 to $299 million in 2011, to $294 million in 2012, and was projected to fall even further, to $254 million in 2013—a decline in EBITDA from 2010 to 2013 of more than 25%.  Over the same period, EBITDA margins also declined from 9.3% in 2010 to a projected 6.7% in 2013.  In

FIRST AMENDED COMPLAINT

four of the six years leading up to the 2014 Transaction, Jones Group had net losses.

**B.    Jones Group Directors and Officers Struggle to Find an Exit Strategy**

47.    In July 2012, the Jones Group Board engaged Citigroup Global Markets Inc. ("Citigroup") to advise it in evaluating strategic alternatives, including the sale of all or part of its business.  Citigroup recognized that Jones Group was a "challenged asset, and it was not clear that anyone could create value from this business."

48.    In early 2013, management reported to the Jones Group Board that Jones Group would record earnings below analyst consensus estimates for the first quarter of 2013, as well as below then-current full-year guidance numbers.

49.    In March 2013, Mitarotonda, one of the Company's largest shareholders, contacted CEO Card and began to press the Jones Group Board to sell parts of the company, reduce costs, and add new directors.  In an April 9, 2013 letter to the Board, Mitarotonda "recommend[ed] that the proceeds from the sale of any brands be used to pay down debt and invest in the Company's core and emerging brands," which he identified as including the Stuart Weitzman brand ("Stuart Weitzman") and Kurt Geiger brand ("Kurt Geiger").  After entering into a settlement and standstill agreement with Jones Group in May 2013, Mitarotonda joined the Jones Group Board.

50.    In April 2013, Jones Group publicly announced restructuring actions, including a plan to close approximately 170 underperforming domestic retail stores by mid-2014.

51.    In or around April 2013, senior Jones Group management fielded calls from third parties indicating an interest in exploring potential transactions to purchase all or a portion of the Company.  One of those calls was from private equity sponsor Sycamore.

52.    Beginning in June 2013, Citigroup contacted ten financial and strategic parties, including Sycamore, that Citigroup identified as being potentially interested in a transaction involving the sale of all or part of Jones Group.  Following media

FIRST AMENDED COMPLAINT

3528605.1

1    reports on July 5, 2013 that Jones Group was in the early stages of a sale process,

2    Jones Group received additional indications of potential interest in a strategic

3    transaction, bringing the total number of potentially interested parties to at least

4    sixteen.  Potential bidders were given access to a Citigroup presentation containing

5    detailed confidential financial information and projections for Jones Group.

6        53.    In July 2013, Sycamore partnered with Kohlberg Kravis Roberts & Co.

7    L.P. ("KKR," and together with Sycamore, the "Sponsors") to submit an indication of

8    interest to purchase all of Jones Group for a price of $18 to $20 per share, implying a

9    total enterprise value of between $2.4 billion and $2.6 billion.  But, when Sycamore

10    and KKR gained access to additional Jones Group internal documents via a Jones

11    Group virtual data room, their interest in proceeding with a deal in that price range

12    faltered.

13        54.    On September 16, 2013, KKR and Sycamore advised Citigroup that after

14    their "extensive additional diligence" they had "considerable reservations regarding

15    the value of the Company," and that if they made a final proposal at all it would be

16    "significantly lower" than the $18 to $20 per share they had indicated previously.

17    Soon thereafter, KKR advised that it was no longer interested in being a 50-50 equity

18    investor with Sycamore in a purchase of Jones Group, and ultimately contributed less

19    than 10% of the investment.

20        55.    During that same time, skepticism regarding Jones Group's prospects

21    was widespread.  In the summer of 2013, for example, one analyst report expressed

22    doubt that "initiatives in place can meaningfully improve the operating performance"

23    of Jones Group, and "encourage[ed] investors to reduce positions."  The report

24    recognized that Stuart Weitzman and Kurt Geiger—two bright spots in Jones Group's

25    portfolio of otherwise stagnant or declining brands—could drive margin expansion

26    and international penetration, but worried that Jones Group would be tempted to sell

27    just those businesses, which would leave an unattractive "overall brand portfolio" and

28    "reduce the potential for future sales and growth."  Sycamore founder Kaluzny, in an

FIRST AMENDED COMPLAINT

3528605.1

1   email prior to the 2014 Transaction, agreed with one analyst's assessment that Jones

2   Group's other brands were "crap."

3       56.   Sycamore indicated its interest in buying just Jones Group's "footwear"

4   business, which included the company's crown jewels—Stuart Weitzman and Kurt

5   Geiger.  The Jones Group Board refused, but advised Sycamore that another party,

6   identified in Jones Group's proxy as "Strategic Party C," had expressed interest in

7   acquiring Jones Group's "apparel" business, and encouraged Sycamore to partner

8   with Strategic Party C in a transaction that would include a sale of the entire

9   company.  Thereafter, Sycamore and Strategic Party C performed further diligence,

10  including review of additional confidential financial information.

11      57.   On October 23, 2013, Strategic Party C, like every other party except

12  Sycamore, told the Jones Group Board that it was no longer interested in pursuing a

13  transaction for the entirety of Jones Group, citing execution risk and value-destructive

14  separation costs associated with Sycamore's plan to break up Jones Group into several

15  smaller businesses.  That same day, Sycamore offered to acquire Jones Group for $14

16  per share, which it later increased to $15 per share, reflecting an enterprise value of

17  $2.15 billion.  During a meeting on October 29, 2013, the Jones Group Board

18  determined that $15 per share "represented a compelling value for the Company" and

19  resolved to "proceed with discussions with Sycamore on that basis."  While Sycamore

20  requested exclusivity, the Jones Group Board refused so that Jones Group "would

21  remain free to consider alternative transactions."  No alternative bid or transaction

22  ever materialized.

23      58.   Because Sycamore intended to acquire Jones Group primarily with debt,

24  it called on Morgan Stanley & Co. LLC and Morgan Stanley Senior Funding, Inc.

25  (collectively and with their respective affiliates, "Morgan Stanley") to assist with debt

26  financing.  Morgan Stanley began working with Sycamore in the summer of 2013 to

27  present a debt financing structure.

28      59.   As is typical in an LBO, it was understood by all—including the

FIRST AMENDED COMPLAINT

Directors and Officers—that the new debt being incurred to make the payments to the Jones Group shareholders, directors, and officers would be an obligation of Jones Group's successor company, not Sycamore. Thus, as the transaction was being planned, the Jones Group directors and officers participated and assisted Sycamore in arranging the debt financing. In August 2013, Jones Group management made a presentation to Morgan Stanley. Between August 2013 and the closing of the 2014 Transaction in April 2014, Jones Group directors and officers provided substantial assistance to Sycamore as Sycamore discussed with Morgan Stanley plans for the LBO and projections of how the post-LBO company would perform, and the structure and syndication of the term loans that would provide necessary financing for the 2014 Transaction.

**C.   Jones Group Directors and Officers, and Sycamore, Plan a Transaction That Will Benefit Them at the Expense of NWHI and Its Creditors**

60.   The 2014 Transaction involved five integrated components that would all occur substantially concurrently.

a.   *The Mergers*. Jones Group would undergo a series of mergers, with the resulting company (to be renamed NWHI) to be controlled by Sycamore.

b.   *The Sponsor Equity*. Sycamore and KKR would contribute at least $395 million in equity to NWHI, which was later reduced to $120 million.

c.   *The Additional Debt*. NWHI would increase its debt from $1 billion to $1.2 billion, which was later increased to $1.55 billion.

d.   *The Shareholder Transfers*. The Jones Group shareholders, which included Jones Group's director and officers, would be cashed out at $15 per share, for a total of approximately $1.2 billion.

e.   *The Carve-Out Transactions*. Shortly before Jones Group's October 29, 2013 board meeting, Kaluzny advised Citigroup that

FIRST AMENDED COMPLAINT

3528605.1

Sycamore intended to transfer ownership of certain of the Company's businesses—Stuart Weitzman, Kurt Geiger, and Jones Apparel (collectively, the "Carve-Out Businesses")—to "Sycamore [a]ffiliates substantially concurrently with the closing of the merger" (such transfers referred to as the "Carve-Out Transactions"). The integrated Carve-Out Transactions were an essential component of Sycamore's bid for Jones Group and the promised cash payout for Jones Group's directors, officers, and shareholders. But the Carve-Out Transactions transferred some of Jones Group's most valuable assets to Sycamore's affiliates— beyond the reach of Jones Group's creditors—for substantially below fair market value.

61.     By virtue of its agreement with the Jones Group Board, Sycamore was able to negotiate *with itself* the prices the Sycamore affiliates paid for each Carve-Out Business. Each purchase agreement was signed by Sycamore co-founder Kaluzny on behalf of the seller entity and by Sycamore co-founder Morrow on behalf of the buyer entity. By stripping Jones Group of its most valuable assets—the Carve-Out Businesses—for a fraction of fair value, Sycamore guaranteed that it would profit handsomely from the 2014 Transaction no matter what happened to the post-LBO NWHI, dubbed "RemainCo," and RemainCo's creditors.

62.     The self-dealing by Sycamore, which was enabled and agreed to by the Jones Group Directors and Officers, was a key part of the 2014 Transaction that was necessary to provide substantial payments and unjust enrichment to the Directors, Officers Defendants, and Shareholder Defendants. Without agreeing to allow Sycamore to strip value from Jones Group via the Carve-Out Transactions, the Jones Group directors could not have obtained the $15 per share bid from Sycamore that funded the payments to all the defendants.

63.     The Jones Group Board facilitated and enabled the Carve-Out

FIRST AMENDED COMPLAINT

3528605.1

Transactions to enrich themselves and the Jones Group shareholders to the detriment of Jones Group, NWHI, and their creditors, while, in various Board resolutions and in the Merger Agreement itself, disclaiming any view as to the fairness of those transactions.

64.    Each of the Directors voted to approve the Merger on December 19, 2013, and the Merger Agreement was signed by Dansky on behalf of Jones Group.

65.    The Directors' resolution approving the Merger Agreement purported to exclude the debt and the Carve-Out Transactions from that approval.  But the debt and Carve-Out Transactions were integral parts of the 2014 Transaction which would have obvious and substantial impact on Jones Group, its successor, NWHI, and the holders of its debt.  The Directors had fiduciary obligations to consider those aspects of the 2014 Transaction.  Given these fiduciary obligations, the Directors could not stick their heads in the sand and decline to assess whether the 2014 Transaction in its entirety—including the layering on of additional debt and the stripping of valuable Jones Group assets as a result of the Carve-Out Transactions—was in the best interests of Jones Group.

66.    The Directors and Officers were privy to the details of the 2014 Transaction.  Even though the resolution purported to exclude the debt and the Carve-Out Transactions from the approval, and the Merger Agreement included provisions that committed Jones Group to assist in NWHI's incurrence of additional debt and execution of the Carve-Out Transactions.

67.    Section 6.14(c) of the Merger Agreement provided:

Prior to the Closing, the Company [i.e., The Jones Group Inc.] shall, and shall cause its Subsidiaries to, and shall use its reasonable best efforts to cause their respective Representatives to, provide to Parent [i.e., Jasper Parent LLC, a newly formed company created by Sycamore to serve as the holding company for RemainCo], at the Parent's sole expense, all cooperation reasonably requested by Parent in connection with the arrangement and consummation of the Financing (including the satisfaction of the conditions precedent set forth therein) and any alternative financing as set forth in Section 6.14(a) . . . .

19

FIRST AMENDED COMPLAINT

The Merger Agreement then went on to list the ways in which such cooperation was required, including assisting with the preparation of presentations and offering documents, participating in meetings, presentations, road shows, due diligence sessions, and drafting sessions, and cooperating with Jasper Parent LLC in the preparation of pro forma financial statements and pro forma adjustments giving effect to the 2014 Transaction—all of which the Directors and Officers in fact did.

68.    Moreover, Section 6.17 of the Merger Agreement provided:

> Carveout Transaction Matters.  If requested by Parent, at Parent's sole expense, the Company shall provide reasonable cooperation to Parent and Merger Sub [i.e., Jasper Merger Sub Inc., a wholly owned subsidiary of Parent created to effectuate the Merger] in connection with Parent and Merger Sub's review of, planning for and implementation of the Carveout Transactions (including, if requested by Parent, reasonable cooperation so that the closing of the Carveout Transactions and the Closing contemplated by this Agreement can occur and be effected concurrently) . . . .

69.    In addition, various of the Directors and Officers, including at least Card, Dickson, McClain, Dansky, and Cade, participated in rating agency presentations and in the preparation of offering memoranda in connection with the 2014 Transaction.

**D.    Jones Group Directors and Officers Allow Sycamore to Reverse-Engineer Its Valuations to Arrive at Desired Valuation Splits between RemainCo and the Carve-Out Businesses**

70.    Sycamore knew that it could purport to justify the low prices it set for the Carve-Out Businesses—and assert that RemainCo was solvent after the 2014 Transaction—only if the great majority of Jones Group's enterprise value was attributed to the RemainCo businesses that would be saddled with debt after the 2014 Transaction, and a much smaller value was attributed to the Carve-Out Businesses being transferred beyond the reach of RemainCo's creditors.  To accomplish this, Sycamore prepared numerous inaccurate projections and valuations of RemainCo and the Carve-Out Businesses.  By March 2014, after Sycamore set RemainCo's debt load and the Sponsors' equity contribution, Sycamore settled on an estimated value of

FIRST AMENDED COMPLAINT

RemainCo of $1.58 billion, which was, quite conveniently, just above the $1.55 billion of debt Sycamore imposed on RemainCo via the 2014 Transaction.

71.    Sycamore's own internal calculations and projections beginning in October 2013—and the incremental shifts in Sycamore's valuations of RemainCo and the Carve-Out Businesses over time, which inexorably moved upward for RemainCo and downward for the Carve-Out Businesses, with the consolidated valuation barely budging—demonstrate that Sycamore's valuations never reflected reality.

72.    Sycamore's internal valuation dated October 29, 2013—the day the Jones Group Board first reviewed Sycamore's $15 per share bid—estimated Jones Group's total value at $2.17 billion, ascribing $1.37 billion of that value to RemainCo, and the remaining $800 million in aggregate value to the Carve-Out Businesses.

73.    Over the course of the ensuing months, Sycamore prepared one internal valuation after another in which Sycamore's purported estimates of the value of RemainCo increased by $210 million and its estimates of the combined value of the Carve-Out Businesses decreased by $160 million, as shown in the following table (numbers in millions of dollars):

| Date | RemainCo | | | Carve-Out Businesses | | | | Sum of the Parts |
|---|---|---|---|---|---|---|---|---|
| | Foot-wear | Jeans-wear | Total | Weitz-man | Geiger | Appa-rel | Total | |
| 10/29/13 | 965 | 405 | 1,370 | 450 | 175 | 175 | 800 | 2,170 |
| 11/01/13 | 1,005 | 405 | 1,410 | 450 | 175 | 135 | 760 | 2,170 |
| 11/04/13 | 1,100 | 405 | 1,505 | 425 | 150 | 90 | 665 | 2,170 |
| 11/29/13 | 1,140 | 420 | 1,560 | 400 | 150 | 90 | 640 | 2,200 |
| 12/16/13 | n/a | n/a | 1,570 | 385 | 145 | 140 | 670 | 2,240 |
| 1/31/14 | n/a | n/a | 1,570 | 385 | 145 | 130 | 660 | 2,230 |
| 3/5/14 | n/a | n/a | 1,580 | 385 | 135 | 120 | 640 | 2,220 |

74.    By March 2014, Sycamore had pushed up its estimate of RemainCo's

FIRST AMENDED COMPLAINT

1   value to $1.58 billion and pushed down its estimate of the value of the Carve-Out

2   Businesses to a combined $640 million.  Notably, Sycamore was just moving value

3   from one of its pockets to the other since its estimate of the Company's total value

4   barely budged during this period, increasing by only $50 million.  In an email just

5   weeks after the 2014 Transaction, KKR correctly recognized that the values attributed

6   to RemainCo and the Carve-Out Businesses by Sycamore were "entirely subjective"

7   and "arbitrary."

8       75.    Nothing in RemainCo's business or performance between October 2013

9   and March 2014 justified these increases.  To the contrary, as described below, brand-

10  level results and projections for RemainCo's performance deteriorated during that

11  period, indicating a *decreasing* value for RemainCo.

12  **E.    Jones Group Management and Sycamore Exaggerate RemainCo's**
    **Estimated 2013 EBITDA**

13

14      76.    In planning the 2014 Transaction, Sycamore purported to "estimate" how

15  RemainCo and the Carve-Out Businesses might have performed in 2013 had those

16  businesses been operating independently of one another during that year and then

17  adjusted those historical estimates to reflect the expected future impact of certain

18  planned Sycamore restructuring initiatives.  However, in doing so, Sycamore

19  manipulated the earnings ascribed to RemainCo.

20      77.    Beginning at least as early as October 2013, Sycamore prepared

21  estimates of RemainCo EBITDA for 2013 that used inputs from Jones Group

22  management and from Sycamore itself to adjust the EBITDA calculation upward.

23  One version of the EBITDA calculation incorporated substantial addbacks provided

24  by Jones Group management purportedly justified by Jones Group's existing

25  restructuring initiatives.  The figures resulting from that version of the calculation

26  were referred to by Jones Group in SEC filings as "Adjusted EBITDA" for 2013.

27  Sycamore sometimes referred to this calculation as "unadjusted," meaning that

28  Sycamore used Jones Group management's upward Adjusted EBITDA as the starting

FIRST AMENDED COMPLAINT

point for further upward adjustments.  These further adjustments included addbacks or increases to 2013 EBITDA purportedly based on steps Sycamore planned to take in 2014 and 2015 after it took control of RemainCo.  That other version of the EBITDA calculation, incorporating both management's and Sycamore's upward adjustments to 2013 EBITDA, was referred to by Jones Group in SEC filings as "Pro Forma Adjusted EBITDA."

78.    In a valuation dated October 23, 2013, Sycamore assumed RemainCo's 2013 Adjusted EBITDA would be $178 million.  By December 2013, Sycamore assumed that number would be $189 million.  By February 2014, the calculation increased once again, this time to $198 million.  The $198 million figure included approximately $60 million in 2013 upward EBITDA adjustments provided by Jones Group management for items like "affiliated company transactions and transaction costs," "impairments and costs related to previously announced restructurings," "purchase accounting adjustments," and "other adjustments."

79.    The $198 million in 2013 Adjusted EBITDA that Sycamore used and that the Directors and Officers included in a March 24, 2014 SEC filing suggested nearly 14% year-over-year growth from RemainCo's 2012 Adjusted EBITDA, which Sycamore had estimated at $174 million.  The increase in 2013 Adjusted EBITDA for RemainCo stood in stark contrast to the more than 11% *decrease* in EBITDA that the whole Jones Group—inclusive of the growing Carve-Out Businesses—actually experienced from 2012 to 2013.

80.    But even $198 million in Adjusted EBITDA would not come close to boosting RemainCo's valuation to the level necessary to support the $1.55 billion in debt RemainCo would be saddled with following the 2014 Transaction.  Therefore, Sycamore took the $198 million Adjusted EBITDA figure that was already inflated with $60 million of adjustments created by Jones Group management, and further increased it with $38 million of speculative adjustments for post-LBO restructuring initiatives, called "Sponsor Addbacks," devised by Sycamore.  Even though these

FIRST AMENDED COMPLAINT

future initiatives had not yet been realized, Sycamore included them as addbacks to historical financial results to produce an even higher Pro Forma Adjusted EBITDA for 2013 of $236 million.

81.     Sycamore repeatedly referred to the $236 million figure as "Adjusted EBITDA" and "Historical Adjusted EBITDA" in public filings and presentations to potential lenders even though its personnel later agreed that it was "misleading" to present this $236 million figure as historical performance data.

82.     To give a veneer of reliability to these inflated pro forma historical results for RemainCo, the Directors and Officers caused Jones Group to, among other things, (a) file with the SEC pro forma financial statements purporting to show how RemainCo would have performed in 2011-2013 if it had existed as a separate entity, (b) make SEC filings presenting estimates of RemainCo's pro forma historical EBITDA, which included the $236 million EBITDA figure calculated by Sycamore, and (c) assist Sycamore in preparing offering memoranda for RemainCo debt that incorporated the pro forma RemainCo financial statements and EBITDA estimates. At the same time, however, buried in a long list of risk factors included in the offering memoranda was the telling admission that the RemainCo pro forma financial statements should not be relied on as representative of its financial results had RemainCo actually existed on a standalone basis; by extension, neither should the EBITDA estimates that had their starting point in those financials.

**F.      Jones Group Directors and Officers Stand by as Sycamore Prepares Forecasts Inconsistent with Jones Group's Performance**

83.     Sycamore's manipulation of the numbers did not stop with the 2013 financials.  It also concocted unreasonable long-range projections for RemainCo.  In particular, Sycamore projected RemainCo's Pro Forma Adjusted EBITDA would be $244 million in 2014, $254 million in 2015, $263 million in 2016, $272 million in 2017, and $282 million in 2018, an increase of 16% in projected EBITDA over four years, when the business's key performance metrics were actually declining.  It

FIRST AMENDED COMPLAINT

1  provided these projections to the valuation firm Duff & Phelps, LLC ("Duff &

2  Phelps") for the purpose of obtaining an opinion on RemainCo's solvency.

3       84.    Sycamore had ample reason to believe the projections used by Duff &

4  Phelps were unreasonable and unjustified.  Just two weeks before the Merger

5  Agreement was signed, Sycamore expressed doubts internally about the viability of

6  one of RemainCo's key brands.  In an email dated December 5, 2013, one of

7  Sycamore's principals wrote: "Let's make sure we're taking a step back and thinking

8  through whether we really want to do this.  I'd keep thinking about ways we get

9  comfortable NW isn't a doomed brand."

10      85.    Indeed, during late October 2013 through April 2014, as Sycamore was

11 preparing more and more aggressive 2014 to 2018 projections for RemainCo, Jones

12 Group's own projections were moving in the opposite direction.  For example,

13 internal Sycamore documents showed that Jones Group management's projections for

14 the business units that would comprise RemainCo were dropping.  In the fourth

15 quarter of 2013, Jones Group's projected sales and gross profit declined by $47

16 million and $20 million, respectively, relative to its Q4 estimates as of September

17 2013.  The businesses that would comprise RemainCo—Footwear and Jeanswear—

18 accounted for all of the $47 million decline in projected sales and $12 million of the

19 $20 million decline in projected gross profit.  The Stuart Weitzman and Kurt Geiger

20 businesses that Sycamore was planning to sell to its affiliates at prices it negotiated

21 with itself, by contrast, were substantially exceeding prior projections and prior year

22 actuals.

23      86.    In an internal December 2013 presentation, Sycamore admitted that

24 Footwear's fourth quarter 2013 trends were "weak" and "could result in a ~$6M

25 shortfall to plan on gross margin," and that positive Jeanswear results earlier in the

26 year were "likely not indicative of [the] long-term growth trajectory of the business."

27 That same month, Sycamore observed that "the entire denim zone is weak."

28      87.    Similarly worrisome, open orders in the businesses that would comprise

FIRST AMENDED COMPLAINT

RemainCo (*i.e.*, orders placed by wholesale customers that had not yet been filled, which are a leading indicator of revenue) were down from the prior year in every month from April 2013 through March 2014.  In March 2014, for example, open orders were down from the prior year for nearly every one of the major brands that would be part of RemainCo.

88.    On April 4, 2014, a Sycamore team member, after reviewing the most recent Jones Group data, warned that "Q2 bookings continue to suffer across the board" at the businesses that would comprise RemainCo (boldfacing in original):

> Nine West:  "At the end of **Q1 core is -4.6% YoY** [year over year] . . . with overall core sales down $11M YoY . . . ; Q2 continues to look worse at **-16.2% YoY for core ($26M)**"

> Jeanswear:  "**Q2 bookings continue to get worse . . . at -18.4% YoY**"

89.    Jones Group's management in March 2014 projected that 2014 revenues from the Footwear component of RemainCo would decline by 5% as compared to the prior year, and that the Jeanswear component would be flat.  Despite this, Sycamore's projections were based in part on the assumption that the revenues of most of RemainCo's leading Footwear and Jeanswear brands would increase by 2% or 3% per year.

90.    Moreover, Sycamore's projections of increasing revenue were particularly unrealistic because Jones Group's store count had decreased by 99 stores in 2013 and 2014 prior to the 2014 Transaction, and Sycamore intended to close more than 60 additional RemainCo stores, moves with obvious negative impacts on RemainCo's revenue stream.

91.    Sycamore's model also assumed the elimination of all 14 members of RemainCo's senior management, which would inevitably have a disruptive effect on RemainCo's operations.

92.    In the first three months of 2014 alone, Jones Group management's

FIRST AMENDED COMPLAINT

3528605.1

1  annual revenue projections for the businesses that would comprise RemainCo steadily

2  declined from an initial budget of $2,267 million to $2,163 million—almost $30

3  million less than the $2,192 million assumed in the Sycamore projections given to

4  Duff & Phelps.  Management's initial budget implied a RemainCo 2014 Adjusted

5  EBITDA of $216 million; by March 2014, management lowered its projections to

6  ones that implied an Adjusted EBITDA of $204 million.  Prior to the Merger's

7  closing, Sycamore internally acknowledged that even that reduced forecast was "too

8  aggressive."  Based on year-to-date trends, discussions with "many people within

9  Jones," and anticipated sales shortfalls of $80 million in the third and fourth quarters

10 of 2014, Sycamore estimated that RemainCo's 2014 Adjusted EBITDA would

11 actually be as low as $160 million, but suggested that if certain mitigation efforts

12 were taken (to reduce buying and inventory for the fourth quarter), then Adjusted

13 EBITDA of $178 million might be achievable—a far lower number than Sycamore

14 was simultaneously asking Duff & Phelps to use for the purpose of opining on

15 RemainCo's solvency.

16     93.    Despite Sycamore's recognition—weeks before the 2014 Transaction

17 was to close—that RemainCo would come nowhere close to the projections Sycamore

18 had given Duff & Phelps, Sycamore did nothing to apprise Duff & Phelps or anyone

19 in the outside world of this information.  Instead, Sycamore deliberately kept this bad

20 news under wraps until after the transaction closed.  As Ryan McClendon of

21 Sycamore recommended to Kaluzny and Morrow on March 31: "Given that we are a

22 week away from close, I also do think it would be ok to ignore this for now, and then

23 quickly pick this up post close."

24     94.    The Directors and Officers received updated reports and projections from

25 Jones Group management on a monthly basis and were therefore aware of the decline

26 in actual and projected performance of the businesses that would comprise RemainCo,

27 and the glowing projections for the performance of the crown jewels that would be

28 sold to Sycamore affiliates.

FIRST AMENDED COMPLAINT

95.     For example, a financial presentation sent to directors Card, Crotty, Georgiadis, Kamens, Kimmel, Mettler, Mitarotonda, Nuechterlein, Robinson, and Wilkins, and officers Cade, Dansky, Dickson, Fersko, and McClain on January 15, 2014 compared budgeted net sales for 2014 with estimated 2013 results.  It stated: "Emerging brands grow at 14.2%, significantly faster than the recurring base of Core & Category.  Core brands and Category labels grow at combined 1.1%."  More than 80% of the brands in the "emerging brands" category were scheduled to be sold to Sycamore affiliates in the Carve-Out Transactions.

96.     A memorandum entitled "February Financial Performance" that CFO McClain sent to the Jones Group Board on March 20, 2014, with a copy to executives Dansky, Dickson, Cade, and others, showed that net revenues for January and February 2014 were down $41.4 million, or 6.5%, compared to the same period a year earlier.  Most of the decline was attributable to "Domestic Wholesale Jeanswear" ($12.8 million) and "Domestic Wholesale Footwear & Accessories" ($11.5 million)— businesses that were slated to become part of RemainCo.  This wholesale performance decline was in addition to the revenue lost due to the closing of retail stores.

97.     The Directors and Officers knew or were reckless in not knowing that there was a substantial disparity between the forecast Sycamore created for RemainCo and was presenting (with their participation) to rating agencies, Morgan Stanley, and potential lenders and the actual performance and management's projected performance of the businesses that would comprise RemainCo.

98.     The Directors and Officers also ignored the negative effects of Sycamore's planned restructuring—effects that were certain to occur in the short term, if not also in the longer term—when they acquiesced in Sycamore's RemainCo projections for 2014 and later years as well as its calculation of 2013 Pro Forma Adjusted EBITDA and Sponsor Addbacks.

99.     Sycamore unreasonably projected that RemainCo's Pro Forma Adjusted

FIRST AMENDED COMPLAINT

1   EBITDA would annually increase by 3% or more beginning in 2014.  Sycamore's

2   projections implied increasing Pro Forma Adjusted EBITDA margins between 11.1%

3   and 12.0%, which corresponded to Adjusted EBITDA margins between 10.5% and

4   11.9%, whereas in the years leading up to the Transaction, RemainCo had failed to

5   achieve Adjusted EBITDA margins greater than 8.9%.

6         100.   Sycamore also artificially enhanced RemainCo's projected Pro Forma

7   Adjusted EBITDA by understating projected expenses, and overstating expense

8   reimbursements, in a variety of unrealistic or misleading ways.  Sycamore removed

9   *all* C-suite expenses from RemainCo's forecast, even though the company would

10   certainly need to (and did) employ executive leadership at substantial expense post-

11   closing.  Further, RemainCo had agreed that, during a limited transitional period, the

12   Carve-Out Businesses would share use of various corporate services provided by

13   RemainCo (such as information technology, distribution, customer service, finance

14   and accounting, human resources, and legal services) and in return would reimburse

15   an allocated portion of RemainCo's corporate services expenses.  But Sycamore's

16   RemainCo projections assumed that, once the transitional period ended, the corporate

17   services expenses previously allocated to the Carve-Out Businesses would disappear,

18   even though some of those expenses were fixed costs that RemainCo would continue

19   to incur regardless of whether the Carve-Out Businesses were using RemainCo's

20   corporate services or not.   Sycamore's projections also ignored Carve-Out Business

21   Jones Apparel's ongoing office sublease expenses, which would become obligations

22   and expenses of RemainCo after Jones Apparel was divested.  Sycamore also moved

23   $72 million of supposed "one-time" reorganization expenses "below the line" so they

24   would not detract from the projected Pro Forma Adjusted EBITDA that Sycamore had

25   calculated.

26         101.   At least some of these reorganization expenses, however, were not "one-

27   time" expenses.  For example, Sycamore caused NWHI to engage Alvarez & Marsal

28   as a restructuring adviser and classified that engagement as a one-time restructuring

FIRST AMENDED COMPLAINT

3528605.1

1   expense.  But Alvarez & Marsal never stopped working at NWHI—indeed, they were

2   still there in 2019.  Pursuant to that engagement, Alvarez & Marsal consultants acted

3   in executive capacities for NWHI from 2014 through 2019.  Because the retention of

4   Alvarez & Marsal was actually a permanent going-forward expense, amounting to

5   millions of dollars per year, it should have been subtracted from Sycamore's

6   calculation of RemainCo's Pro Forma Adjusted EBITDA rather than treated as a one-

7   time item.

8   **G.   Jones Group's Directors and Officers Fail to Protect the Company When**
       **Sycamore Substitutes More Debt for Equity**

9

10   102.   In a December 19, 2013 Equity Commitment Letter of which Jones

11   Group was an express third-party beneficiary, Sycamore "commit[ted]" to contribute

12   an aggregate of $551 million of equity to the 2014 Transaction, including "such

13   amounts as will satisfy the minimum equity contribution requirements of the Debt

14   Financing Commitments."  In a December 19, 2013 Debt Commitment Letter with

15   NWHI's lenders, Sycamore in turn stated that its "RemainCo Equity Contribution

16   shall be not less than $395 million and shall represent not less than 25% of the pro

17   forma total debt and equity capitalization of the RemainCo Borrower and its

18   subsidiaries after giving effect to the Transactions."  On that basis, the Directors and

19   Officers caused Jones Group to enter into the Merger Agreement on December 19,

20   2013.

21   103.   However, Sycamore subsequently reneged on its commitment that its

22   RemainCo equity contribution would be not less than $395 million and would

23   represent not less than 25% of RemainCo's total debt and equity capitalization.

24   Instead, by the time of the closing of the 2014 Transaction, Sycamore and KKR had

25   reduced their combined RemainCo equity contribution by $275 million, to a mere

26   $120 million, or 8% of RemainCo's total capitalization.  Morgan Stanley

27   characterized Sycamore's and KKR's investment as the "LOWEST LBO EQUITY

28   CHECK IN DECADES."  By contrast, Sycamore's and KKR's combined equity

FIRST AMENDED COMPLAINT

3528605.1

commitment for the Carve-Out Businesses ranged from 15% to 34% of total capitalization even though those businesses had higher growth prospects.

104.  Given that the purchase price was not changing, the decrease in the equity contribution corresponded to an increase in the amount of debt incurred by the Company.  As the 2014 Transaction was actually executed, the debt NWHI incurred increased from an originally anticipated amount of $1.206 billion to $1.550 billion.

105.  The Directors and Officers were aware of the significant reduction in Sycamore's equity commitment to RemainCo and the concomitant increase in debt. Yet they took no action to stop the Merger (or even, at a minimum, assess for themselves the impact on RemainCo's solvency) when Sycamore cut its equity commitment by 70% and increased debt by more than $340 million.

106.  Citigroup had advised the Directors and Officers that, in the context of an LBO where Jones Group *retained* all of its businesses, Jones Group could support total debt equal to 5.1 times its estimated 2013 EBITDA.  The Directors and Officers knew, however, that the 2014 Transaction would *not* retain all of Jones Group's businesses, but instead would *divest* its fastest-growing businesses, thereby reducing RemainCo's ability to service debt.   Even though RemainCo's legacy businesses would be challenged, in Citigroup's words, to sustain "[l]ow single digit growth," the 2014 Transaction did not lessen RemainCo's debt load but instead increased it to a dramatically *higher* multiple of EBITDA.  By contrast, the Carve-Out Businesses—Stuart Weitzman, Kurt Geiger, and Jones Apparel—were capitalized with much less debt and placed outside the reach of RemainCo's creditors.

107.  As a result of the revisions to the 2014 Transaction between December 19, 2013 and the April 8, 2014 closing, NWHI's total debt was 7.8 times the $198 million 2013 Adjusted EBITDA calculated by Jones Group's management and 6.6 times the inflated $236 million 2013 Pro Forma Adjusted EBITDA that Sycamore calculated.  Those multiples were 53% and 29% higher respectively than the 5.1x multiple of EBITDA (adjusted for restructuring cost savings) that Citigroup had told

FIRST AMENDED COMPLAINT

1   the Directors and Officers the Company could support in a scenario where it retained

2   all of its businesses.  They were also far higher than the multiples of all of the

3   comparable companies Citigroup used as "benchmarks"; those companies' median

4   debt-to-EBITDA multiple was only 0.8 times.

5       108.   After Jones Group's entry into the Merger Agreement, the Directors and

6   Officers had a continuing legal obligation to make a reasonable, good-faith

7   investigation to determine whether the 2014 Transaction remained in the best interests

8   of Jones Group as the terms of the 2014 Transaction changed in the months between

9   signing and closing.

10       109.   Section 6.2(c) of the Merger Agreement contained a "fiduciary out"

11   provision that allowed the Directors to withdraw their recommendation in favor of the

12   Merger if they determined, after consultation with counsel, that withdrawal "could be

13   required by the directors' fiduciary duties under applicable law."  The Directors had

14   the ongoing obligation to monitor and assess whether the Merger was in Jones

15   Group's best interests and had the ability to change their recommendation upon

16   making such a determination.  Yet, following the signing of the Merger Agreement,

17   the Directors did not make any effort to investigate and determine whether the

18   massive debt incurred by Jones Group in connection with the 2014 Transaction was in

19   the best interests of the Company.

20       110.   In addition, Section 7.3 of the Merger Agreement conditioned Jones

21   Group's obligation to close the Merger on the truth and correctness of Sycamore's

22   representation and warranty that RemainCo would be solvent after consummation of

23   the LBO and Carve-Out Transactions.  Sycamore's controlled affiliates Jasper Parent

24   LLC and Jasper Merger Sub, Inc. represented and warranted in Section 5.2(k) of the

25   Merger Agreement that "the Surviving Corporation will be Solvent as of the Effective

26   Time and immediately after the consummation of the Merger and the other

27   Transactions," including the Carve-Out Transactions and the LBO Debt (as hereafter

28   defined).  The Directors and Officers did not make any effort, or undertake any

FIRST AMENDED COMPLAINT

1  reasonable investigation, to determine the truth and correctness of Sycamore's

2  representation about solvency.

3      111.  Furthermore, Section 8.3(b) of the Merger Agreement provided that the

4  "Agreement may be terminated and the Merger may be abandoned by the Company . .

5  . at any time prior to the Effective Time, if there has been a breach of any

6  representation, warranty, covenant or agreement made by Parent or Merger Sub in this

7  Agreement, or any such representation and warranty shall have become untrue after

8  the date of this Agreement, such that the conditions set forth in Sections 7.3(a) or

9  7.3(b) would not be satisfied . . . ."

10      112.  Despite glaring warning signs that the debt load that the Company would

11  incur to finance the LBO was contrary to its best interests and unsustainable, the

12  Directors and Officers made no efforts, reasonable or otherwise, to determine whether

13  the debt that the LBO would place upon RemainCo would render NWHI insolvent,

14  leave it with unreasonably small capital, or render it unable to pay its debts as they

15  came due.  The Directors and Officers made no efforts to engage an expert to render a

16  solvency opinion, assess the truth and accuracy of Sycamore's representation and

17  warranty regarding solvency, or otherwise consider whether the LBO, the Carve-Out

18  Transactions, and the LBO Debt would render NWHI insolvent.

19      113.  In addition, various of the Directors and Officers knew that NWHI was

20  to receive from Sycamore far less than fair value for the Carve-Out Businesses.  In

21  December 2013, Cade, Dansky, Fersko, and McClain were among those provided

22  with copies of the purchase agreements for the Carve-Out Businesses that disclosed

23  that Sycamore's affiliates planned to pay substantially less for the three Carve-Out

24  Businesses than the more than $800 million Jones Group had paid to acquire Stuart

25  Weitzman and Kurt Geiger alone—businesses that had only increased in value since

26  they were purchased between 2010 and 2012.  In January 2014, Card, Dickson, and

27  McClain were provided with a presentation that showed that Sycamore affiliates

28  planned to pay only $620 million for the Carve-Out Businesses.  In April 2014,

FIRST AMENDED COMPLAINT

3528605.1

1   Donnalley, Jones Group's Treasurer, signed a Disbursement Authorization Letter in

2   connection with the LBO that contained a "Total Jones Group Sources and Uses

3   Summary," which also disclosed the prices for which the Carve-Out Businesses were

4   being sold.

5        114.   The fact that the Carve-Out Businesses were worth at least their

6   $800 million original purchase price implied that the rest of Jones Group (RemainCo)

7   was worth no more than $1.4 billion—the difference between Sycamore's $2.2 billion

8   purchase price for the entirety of Jones Group and $800 million.  That knowledge

9   alone should have alerted reasonable and loyal directors and officers to the need to

10  undertake some investigation into RemainCo's solvency, especially when in February

11  and March 2014 Sycamore arranged for the debt on RemainCo to be increased to

12  $1.46 billion (ultimately $1.55 billion), since it implied that RemainCo likely had a

13  capital deficit.  Instead, in breach of their duties of care, loyalty, and good faith, the

14  Directors and Officers did nothing to investigate the Company's solvency, while

15  doing everything they could to advance Sycamore's plans and their own multimillion-

16  dollar payouts.

**H.    Sycamore Withholds Its Lower "Base Case" Projections from Duff &
17      Phelps, and Duff & Phelps Uses Sycamore's Manipulated "Upside"
18      Projections in Its Solvency Opinion**

19       115.   To obtain a solvency opinion for RemainCo in connection with the LBO,

20  in February 2014 Sycamore retained Duff & Phelps, which between 2011 and 2013

21  had performed nine engagements for Sycamore or its portfolio companies.

22       116.   To prepare an opinion that RemainCo would be solvent after the

23  transaction (the "D&P Solvency Opinion"), Duff & Phelps relied on Sycamore's

24  estimates and projections of RemainCo's Pro Forma Adjusted EBITDA.

25       117.   The D&P Solvency Opinion, rendered on April 4, 2014, was based on

26  the express assumption that "the Management Projections furnished to Duff & Phelps

27  were reasonably prepared and based upon the best currently available information and

28  good faith judgment of the person furnishing the same."  Duff & Phelps expressly

FIRST AMENDED COMPLAINT

1   "[r]elied upon the accuracy, completeness, and fair presentation" of these projections

2   and "did not independently verify" them.  Duff & Phelps warned that if any of the

3   information it had been asked to assume proved to be untrue in any material respect,

4   its "Opinion cannot and should not be relied upon."

5        118.   Sycamore did not prepare these estimates and projections in a good faith

6   effort to assess RemainCo's future prospects and solvency, but to ensure that Jones

7   Group's total enterprise value was split between RemainCo and the Carve-Out

8   Businesses in a manner favorable to Sycamore's investment scheme.

9        119.   Furthermore, the projections used in the D&P Solvency Opinion were

10   not Sycamore's "base case" (i.e., most likely) projections, but its "upside" (more

11   optimistic) ones.  Between the time of the Merger Agreement in December 2013 and

12   early March 2014, Sycamore's base case projected that year-five (*i.e.*, 2018) "exit

13   EBITDA" for RemainCo ranged from $240 million to $245 million, while its upside

14   case projected a range from $280 million to $285 million.  Sycamore did not provide

15   Duff & Phelps with its base case projections.  In fact, the numbers Duff & Phelps

16   used in its solvency analysis fell squarely within Sycamore's *upside* case.

17        120.   As the original administrative agent and lead arranger for the Term

18   Loans (as hereafter defined), Morgan Stanley prepared a model dated April 4, 2014

19   that included Pro Forma Adjusted EBITDA projections for RemainCo in a "downside

20   case" (economic downturn) and in a "base case" (business as usual).  The Morgan

21   Stanley model also had much higher projections that Morgan Stanley called the

22   "Sycamore case."  The "Sycamore case" projections were materially identical to the

23   projections Sycamore had supplied to Duff & Phelps for its solvency opinion.  The

24   chart below compares Morgan Stanley's base case and downside case Pro Forma

25   Adjusted EBITDA projections (in millions of dollars) with the Sycamore projections

26   that Duff & Phelps used for its solvency analysis:

27

28

FIRST AMENDED COMPLAINT

3528605.1

| | Morgan Stanley | | |
|---|---|---|---|
| Year | Downside | Base Case | Sycamore Case |
| **2013** | $224 | $224 | $236 |
| **2014** | $154 | $228 | $244 |
| **2015** | $114 | $238 | $254 |
| **2016** | $131 | $247 | $263 |
| **2017** | $140 | $256 | $272 |
| **2018** | $142 | $203 [*sic*] | $282 |

121.   Had Morgan Stanley's downside and base case projections been used in a solvency analysis, it would have shown that RemainCo would be insolvent by hundreds of millions of dollars.

122.   The D&P Solvency Opinion was rendered worthless by its use of Sycamore's manipulated projections.  But even using those projections, Duff & Phelps showed RemainCo to be perilously close to insolvency and inadequately capitalized.  And numerous other errors infected Duff & Phelps' analysis, including its use of overstated management adjustments and Sponsor Addbacks, its inclusion of incorrect time periods in its analysis, and its use of a weighted average cost of capital that was substantially less than the weighted average cost of capital Duff & Phelps used in another valuation of RemainCo it prepared for Sycamore as of the closing date.  Duff & Phelps also used an incorrect amount of closing debt.  Had these defects been corrected, Duff & Phelps would have found that RemainCo was insolvent.

123.   Plaintiff has found no evidence that the Directors were aware of the D&P Solvency Opinion at the time they allowed the 2014 Transaction to proceed.  But even if they were aware of the D&P Solvency Opinion, it would have been of no consequence, as that opinion was prepared for Sycamore, not Jones Group, and the opinion stated that it should not be relied upon by anyone other than Sycamore.  Any reliance on the D&P Solvency Opinion would have been unwarranted for the

FIRST AMENDED COMPLAINT

3528605.1

additional reason that, as the Directors knew or should have known, the projections on which the opinion was based were inflated and inconsistent with the other information discussed above.

## I.   A Realistic Analysis Would Have Shown That the 2014 Transaction Would Render NWHI Insolvent

124.   An honest and realistic analysis of NWHI's solvency would, among other things, have taken into account (a) the first quarter 2014 performance of the businesses that would become NWHI; (b) the problematic economic outlook for the retail industry generally and the brands NWHI was retaining specifically; (c) the likely disruptive effects of the store closings, organizational restructurings, and management changes that Sycamore planned to make; and (d) various errors made by Duff & Phelps.  Such an analysis would have shown that the 2014 Transaction would render NWHI insolvent, with unreasonably small capital, and unable to pay its debts as they came due.

125.   A discounted cash flow analysis that applied reasonable and realistic projections for NWHI would have calculated a total enterprise value for NWHI that was hundreds of millions of dollars less than its debt of $1.55 billion, showing NWHI was insolvent.

126.   A multiples analysis involving comparable companies that applied reasonable and realistic projections for NWHI, and took into account the lower multiples that would be appropriate for RemainCo, would have indicated a total enterprise value of less than $1.55 billion, showing NWHI was insolvent.

127.   Inasmuch as its equity was equal to only 8% of its total capitalization, NWHI had unreasonably small capital.  Companies comparable to NWHI averaged equity equal to approximately 90% of their total capitalization.

128.   Any reasonable projection would have shown that NWHI would generate insufficient cash flow during the period 2014 to 2019 to repay the approximately $1.18 billion of debt that would come due in 2019.  Given its likely financial

FIRST AMENDED COMPLAINT

1    performance, NWHI would not have the ability to pay this debt when it came due
2    either from its own resources or through capital markets activity.

3        129.   The Carve-Out Transactions confirm NWHI's insolvency.  Prior to the
4    2014 Transaction, Jones Group's total enterprise value was approximately $2.2
5    billion.  The Carve-Out Businesses that Sycamore transferred away represented more
6    than $1 billion of that value.  The value remaining at NWHI was far less than the
7    $1.55 billion in debt piled onto its balance sheet by the 2014 Transaction.

8    **J.    The 2014 Transaction Closes**

9        130.   On April 8, 2014, the 2014 Transaction was carried out as a single,
10   integrated transaction with the following components.  Each of the Directors and
11   Officers had knowledge of the multiple component transactions that were part of the
12   2014 Transaction.  None of the component transactions would have occurred on its
13   own.  Each component transaction was dependent or conditioned on the other
14   components.

15       131.   *The Mergers*.  Sycamore created a new subsidiary into which Jones
16   Group was merged and ultimately renamed NWHI.  Sycamore did this by having
17   Jasper Merger Sub, Inc., a subsidiary of Jasper Parent LLC (a company previously
18   formed by Sycamore) merge with and into The Jones Group Inc. (with The Jones
19   Group Inc. as the surviving corporation).  At that time, each share of The Jones Group
20   Inc. was cancelled and converted into the right to receive $15 per share in cash, and
21   Jasper Parent LLC became the owner of all the stock of The Jones Group Inc. through
22   its ownership of Jasper Merger Sub, Inc.  The Jones Group Inc. then went through a
23   series of mergers with its subsidiaries, with the surviving corporation renamed NWHI.

24       132.   *The Sponsor Equity*.  Sycamore and KKR made an equity investment in
25   NWHI of just $120 million—8% of the $1.55 billion in debt with which NWHI was
26   left after the 2014 Transaction.  Sycamore and KKR made that equity investment
27   through the same funds that owned the Sycamore affiliates that simultaneously
28   acquired the Carve-Out Businesses for hundreds of millions of dollars below the

FIRST AMENDED COMPLAINT

1   Carve-Out Businesses' value.  Because these affiliates stripped away the Carve-Out

2   Businesses cheaply, the investing funds would profit on a net basis even if RemainCo

3   failed.

4         133.  *The Additional Debt*.  NWHI incurred $873.8 million of debt, which was

5   used to make part of the more than $1.1 billion payment to Jones Group's former

6   shareholders and to pay financing fees and expenses.  NWHI's borrowings included a

7   $445 million Secured Term Loan and a $300 million Unsecured Term Loan

8   (collectively, the "Term Loans"), and a $128.8 million Asset-Based Loan ("ABL"),

9   $60 million of which was shortly thereafter paid down by issuing $60 million in new

10  2019 Notes. (The Term Loans and ABL are referred to herein as the "LBO Debt.")

11  NWHI incurred the obligation to repay the LBO Debt, but it received none of the

12  benefit, as all of the proceeds went directly to Jones Group's former shareholders

13  ($831.4 million) or to pay credit facility fees and expenses ($42.4 million).  In

14  addition to the new LBO Debt incurred, NWHI was burdened with another $655.6

15  million in existing debt rolled over from Jones Group, including $395.3 million in

16  unsecured notes due 2019, $250 million in unsecured notes due 2034, and $10.3

17  million in 2016 notes related to the Kurt Geiger business that NWHI was divesting in

18  the 2014 Transaction.  The LBO Debt was granted contractual and/or structural

19  protections—either being secured, or supported by subsidiary guarantees—so that,

20  even in the event of an NWHI bankruptcy, assets would likely be available to pay all

21  or substantially all of the LBO Debt; by contrast, holders of the existing, rolled-over

22  unsecured debt enjoyed no such protection and would receive a recovery only after all

23  the LBO Debt was repaid.

24        134.  *The Shareholder Transfers*.  NWHI paid Jones Group's shareholders

25  $1.183 billion for their shares.  The payments for Common Shares in the LBO,

26  totaling $1.105 billion, were made by a non-agent contractor that performed the

27  ministerial function of processing share certificates and cash, and whose rights and

28  obligations were governed solely by contract.  The payments made for Restricted

FIRST AMENDED COMPLAINT

Shares, accumulated unpaid dividends on Restricted Shares, and Share Equivalent Units, collectively totaling $78 million, were processed through the payroll and by other means.

135.    *The Carve-Out Transactions*.  As part of the closing of the 2014 Transaction, pursuant to the Merger Agreement and other transaction documents, Sycamore (and its principals Kaluzny and Morrow, who became NWHI's sole directors) caused NWHI to sell the three Carve-Out Businesses—Stuart Weitzman, Kurt Geiger, and Jones Apparel—to newly formed Sycamore affiliates.  The Carve-Out Businesses were collectively worth more than $1 billion at the time (and in fact were resold to third parties for over $1 billion shortly thereafter, even after generating more than $140 million in post-closing dividends to Sycamore and KKR) but were sold in the 2014 Transaction to the Sycamore affiliates for just $641 million ($110 million for Jones Apparel, $395 million for Stuart Weitzman, and $136 million for Kurt Geiger).  About half of the $641 million proceeds from the sale were used to make part of the payment to Jones Group's former shareholders.  The remainder went to paying off Jones Group's 2014 Notes and to transaction fees and expenses.  No material part of the value from the sale of the Carve-Out Businesses to Sycamore affiliates was retained by Jones Group or NWHI.

136.    In addition to incurring the LBO Debt, NWHI retained or refinanced nearly $1 billion in pre-existing Jones Group notes:

> a.    Approximately $263 million in pre-LBO unsecured 5.125% notes due in 2014 (the "2014 Notes") were redeemed in full using part of the proceeds from the sale of the Carve-Out Businesses and a payment by Sycamore.

> b.    Approximately $400 million in pre-LBO unsecured 6.875% notes due in 2019 (the "Old 2019 Notes") had the option to be redeemed or refinanced due to a change of control provision triggered by the 2014 Transaction.  With access only to misleading information made available

FIRST AMENDED COMPLAINT

to them concerning the value and performance of RemainCo and the Carve-Out Businesses, the holders of approximately $367 million of the Old 2019 Notes exchanged them for newly issued 2019 notes bearing a higher interest rate of 8.25% (the "New 2019 Notes").  (Shortly after the closing, NWHI issued an additional $60 million of New 2019 Notes.) Holders of approximately $5 million of Old 2019 Notes elected to redeem them, which was done by a payment by Sycamore.  The approximately $28 million of Old 2019 Notes that remained rolled over to NWHI's balance sheet.

    c.  Approximately $250 million in pre-LBO unsecured 6.125% notes due in 2034 had no change of control put right, and therefore had no choice but to remain in NWHI's post-LBO, post-Carve-Out Transaction capital structure.

137.  The 2014 Transaction resulted in the Company significantly increasing its debt while having far fewer assets:

| Obligation | Debt (in millions) | |
| --- | --- | --- |
| | Jones Group | NWHI |
| Asset-Based Loan | $   78 | $   69 |
| Secured Term Loan | 0 | 445 |
| Unsecured Term Loan | 0 | 300 |
| 2014 Notes | 263 | 0 |
| 2016 Loan Notes | 10 | 10 |
| Old 2019 Notes | 400 | 28 |
| New 2019 Notes | 0 | 427 |
| 2034 Notes | 250 | 250 |
| Capital Leases | 21 | 21 |
| **Total** | **$1,022** | **$1,550** |

**K. RemainCo's Disastrous Post-LBO Performance Corroborates the Contemporaneous Evidence That Sycamore's Projections Were Unrealistic and Unreliable**

138.  Sycamore's deliberate inflation of the projections it created prior to the

FIRST AMENDED COMPLAINT

3528605.1

consummation of the LBO is corroborated by RemainCo's post-LBO performance, which never came close to matching Sycamore's exaggerated forecasts.  For instance, in 2014, RemainCo's Adjusted EBITDA fell to $178 million—$66 million, or 27%, less than the  $244 million projection Sycamore had given to Duff & Phelps for its solvency analysis, but consistent with the $178 million in Adjusted EBITDA that Sycamore had internally estimated shortly before the 2014 Transaction closed.  The disparity between the projections given to Duff & Phelps and actual performance is starkly illustrated in the chart below:



139.   Other key operating metrics—revenue, gross profit, and operating income—also dramatically underperformed Sycamore's forecasts in the post-LBO period:

FIRST AMENDED COMPLAINT

3528605.1







FIRST AMENDED COMPLAINT

3528605.1

**L.**     **Sycamore Takes Dividends from the Carve-Out Businesses Shortly After Closing and Then Resells the Carve-Out Businesses to Third Parties at Massive Profits**

140.   Soon after it acquired the Carve-Out Businesses at big discounts, Sycamore and KKR began taking more than $140 million in dividends from these businesses, and began marketing them for sale for hundreds of millions of dollars more than the Sponsors paid for them in the 2014 Transaction:

a.     In September 2014, Stuart Weitzman issued $82 million in dividends to Sycamore and KKR.  Then, in January 2015, Sycamore affiliates agreed to sell Stuart Weitzman to a third party (Coach, Inc.) for $549 million, consisting of $531 million in cash plus a contingent earnout then valued at $18 million. The $549 million sales price was $154 million more than the $395 million the Sponsors paid for the same business in the 2014 Transaction.  Including the $82 million in dividends received, the Sponsors' profit was $236 million.

b.     In September 2014, Jones Apparel issued $40 million in dividends to Sycamore and KKR.  Then, in April 2015, Sycamore sold a portion of the Jones Apparel business (namely, the Jones New York intellectual property) to a third party (Authentic Brands Group) in April 2015 for $75 million, leaving behind a business called the Kasper Group ("Kasper").  Sycamore then sold Kasper back to NWHI in January 2017 for $40 million, while retaining $30 million in accounts receivable and $1 million in cash, for total consideration for the entire Jones Apparel Carve-Out Business of $146 million—$36 million more than their $110 million purchase price.  When the $40 million in dividends is included, the Sponsors' profit was $76 million.

c.     In February 2015, Kurt Geiger paid out $22 million to Sycamore and KKR through dividends and share repurchases.  Then, in December 2015, Sycamore sold Kurt Geiger to a third party (Cinven

FIRST AMENDED COMPLAINT

Limited) for $371 million, representing a $235 million premium over the $136 million purchase price paid by Sycamore for the same business in April 2014.  Including the $22 million in dividends, the Sponsors' profit was $257 million.

141.   The Carve-Out Transactions valued the Carve-Out Businesses at $641 million when, by any measure of fair value, they were worth well more than $1 billion (amounts in millions):

| Carve-Out Business | Purchase Consideration | Resale Consideration | Dividends Paid | Total | Under-payment |
|---|---|---|---|---|---|
| Stuart Weitzman | $395 | $549 | $82 | $631 | $236 |
| Jones Apparel | 110 | 146 | 40 | 186 | 76 |
| Kurt Geiger | 136 | 371 | 22 | 393 | 257 |
| **Totals** | **$641** | **$1,066** | **$144** | **$1,210** | **$569** |

142.   As a result of these outsized returns from the Carve-Out Businesses, Sycamore earned a 250% return on its equity investment in the Carve-Out Businesses, and a 108% return on the entire 2014 Transaction, inclusive of its losses from RemainCo.

**M.   Insolvent NWHI Sinks into Bankruptcy**

143.   Predictably, the years following the 2014 Transaction were disastrous for NWHI.  In the nine months ended December 31, 2014, NWHI lost $133 million.  It lost $433 million in 2015, $162 million in 2016, and $201 million in 2017.  NWHI lost another $135 million from January 1 to April 7, 2018.  NWHI's total losses from April 2014 to April 2018 were thus $1.064 billion.

144.   NWHI lost an additional $569 million as a result of selling the Carve-Out Businesses for less than their fair market value.

145.   NWHI also incurred more than $170 million in interest expense on the LBO Debt from April 8, 2014 to March 20, 2019.

3528605.1

1    146.  On April 6, 2018, NWHI filed for bankruptcy.

2    147.  More than $685 million of the Old 2019 Notes, New 2019 Notes, and

3    2034 Notes remains unpaid (the "Noteholder Claims").

4    148.  As part of the bankruptcy Plan, Sycamore and KKR gave money back to

5    the Debtors' estates in exchange for releases of any claims against them.  The Plan

6    also provided releases for the Sponsors' principals and affiliates, the Term Loan

7    lenders, and NWHI's post-April 8, 2014 directors and officers, among others.  But the

8    Directors, Officers, and the other Shareholder Defendants who collectively received

9    approximately $1.2 billion in the 2014 Transaction were not released and have so far

10   retained the cash they received at the expense of Jones Group's creditors.  They have

11   had the benefit of that cash for more than six years.

12   149.  The Indenture Trustee seeks to recover the Shareholder Transfers and

13   pre- and post-judgment interest, attorneys' fees, costs, and other expenses.

14
**CLAIM I**
**Avoidance and Recovery of the Shareholder Transfers as**
15
**Constructive Fraudulent Conveyances**
**(Against the Shareholder Defendants)**
16

17   150.  Plaintiff repeats and realleges each and every allegation in all prior

18   paragraphs, which are incorporated by reference as if set forth fully herein.

19   151.  On or after April 8, 2014, Jones Group's successor NWHI transferred

20   approximately $1.2 billion in cash to Jones Group's former shareholders—including

21   the Shareholder Defendants—in connection with the 2014 Transaction.

22   152.  NWHI did not receive, and none of the Shareholder Defendants gave,

23   fair consideration or reasonably equivalent value in exchange for these Shareholder

24   Transfers.

25   153.  At the time the Shareholder Transfers were made or as a result of making

26   the Shareholder Transfers, (a) NWHI was or became insolvent, in that the present fair

27   salable value of NWHI's assets was less than the amount that would have been

28   required to pay NWHI's probable liabilities on its existing debts as they became

FIRST AMENDED COMPLAINT

3528605.1

absolute and matured; (b) NWHI was engaged or was about to engage in a business or transaction for which the property or assets remaining with NWHI after making the Shareholder Transfers was an unreasonably small capital, or were unreasonably small in relation to the business or transaction; and/or (c) NWHI intended to incur or believed or reasonably should have believed that it would incur debts beyond its ability to pay as they matured or became due.

154.   Accordingly, the Shareholder Transfers should be set aside, avoided, and recovered to the extent necessary to satisfy the Noteholder Claims, pursuant to N.Y. DEBT. & CRED. LAW §§ 273, 274, 275, 278, and 279, CAL. CIV. CODE §§ 3439.04(a)(2), 3439.05, 3439.07, and 3439.08(b), or other applicable state law.

### CLAIM II
#### Avoidance and Recovery of the Shareholder Transfers as Intentional Fraudulent Conveyances
#### (Against the Shareholder Defendants)

155.   Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

156.   On or after April 8, 2014, Jones Group's successor NWHI transferred approximately $1.2 billion in cash to Jones Group's former shareholders—including the Shareholder Defendants—in connection with the 2014 Transaction.

157.   NWHI, by and through its officers, directors, shareholders, and agents, including the Sponsors, made the Shareholder Transfers with actual intent to hinder, delay, or defraud its present or future creditors, which intent is demonstrated by, among other things, the following badges of fraud:

a.   NWHI did not receive fair consideration or reasonably equivalent value in exchange for the Shareholder Transfers;

b.   The Shareholder Transfers were part of the 2014 Transaction that rendered NWHI insolvent, inadequately capitalized, and unable to pay its debts as they matured;

FIRST AMENDED COMPLAINT

c.  The recipients of the Shareholder Transfers included Jones Group's directors, officers, and other fiduciaries who effectuated the 2014 Transaction and stood to receive millions of dollars from the cancellation of their Jones Group shares and the receipt of additional compensation if the 2014 Transaction was consummated;

d.  The Shareholder Transfers were part of the 2014 Transaction that transferred all or substantially all of the value of NWHI to Jones Group's shareholders, the Sponsors, and the LBO Debt lenders, and away from the pre-LBO creditors of NWHI;

e.  The Shareholder Transfers were part of the 2014 Transaction that the Sponsors intended would enable them to make hundreds of millions of dollars of profits at the expense of NWHI and its creditors;

f.  The Shareholder Transfers were not undertaken in the regular course of Jones Group's or NWHI's business;

g.  The Shareholder Transfers occurred at the same time as, and were made from the proceeds of, the LBO Debt;

h.  The Directors, Officers, and Sponsors advocated for and/or approved the 2014 Transaction notwithstanding that they knew that, or recklessly disregarded whether, the 2014 Transaction would render NWHI insolvent, inadequately capitalized, and unable to pay its debts as they came due;

i.  The Directors, Officers, and Sponsors pursued the 2014 Transaction even though they knew it would involve NWHI incurring unacceptably high levels of debt compared to its projected EBITDA;

j.  The Directors, Officers, and Sponsors pursued the 2014 Transaction even though they knew that the Sponsors had reneged on their previously announced commitment to invest at least $395 million of equity in RemainCo, and were instead investing only $120 million;

48

FIRST AMENDED COMPLAINT

k.      Jones Group's management and the Sponsors engaged in deceptive conduct in connection with the 2014 Transaction and the Shareholder Transfers by, among other things, concealing their March 2014 projections from the market, prospective lenders, and Duff & Phelps; and

l.      The Directors, Officers, and Sponsors were aware that the 2014 Transaction involved selling the Carve-Out Businesses at far less than their fair value.

158.   Accordingly, the Shareholder Transfers should be set aside, avoided, and recovered to the extent necessary to satisfy the Noteholder Claims, pursuant to N.Y. DEBT. & CRED. LAW §§ 276, 278, and 279, CAL. CIV. CODE §§ 3439.04(a)(1), 3439.07, and 3439.08(b), or other applicable state law.

## CLAIM III
### Avoidance and Recovery of the Change in Control Payments as Constructive and Intentional Fraudulent Conveyances
### (Against Dickson)

159.   Plaintiff repeats and realleges each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

160.   Dickson received Change in Control Payments in the amount of $6,868,904.

161.   NWHI did not receive fair consideration or reasonably equivalent value for making the Change in Control Payments.

162.   At the time the Change in Control Payments were made or as a result of making the Change in Control Payments, NWHI (i) was or became insolvent; (ii) was engaged or about to engage in a business or a transaction for which NWHI was left with unreasonably small capital or assets; and/or (iii) intended or believed or reasonably should have believed that it would incur debts beyond its ability to pay as they matured or became due.

163.   NWHI, by and through certain of its officers, directors, shareholders, and agents, made the Change in Control Payments with actual intent to hinder, delay, or

FIRST AMENDED COMPLAINT

3528605.1

1   defraud its present or future creditors.

2       164.   Accordingly, the Change in Control Payments should be set aside,

3   avoided, and recovered to the extent necessary to satisfy the Noteholder Claims,

4   pursuant to N.Y. DEBT. & CRED. LAW §§ 273, 274, 275, 276, 278, and 279, CAL. CIV.

5   CODE §§ 3439.04(a)(1), 3439.04(a)(2), 3439.05, 3439.07, and 3439.08(b), or other

6   applicable state law.

7   **PRAYER FOR RELIEF**

8       WHEREFORE, by reason of the foregoing, Plaintiff respectfully requests that

9   this Court enter judgment against defendants as follows:

10       (a)   setting aside, avoiding, and granting recovery of the Shareholder

11   Transfers paid to the Shareholder Defendants to the extent necessary to satisfy the

12   Noteholder Claims;

13       (b)   setting aside, avoiding, and granting recovery of the Change in Control

14   Payments paid to Dickson to the extent necessary to satisfy the Noteholder Claims;

15       (c)   awarding Plaintiff pre- and post-judgment interest at the maximum rate

16   permitted by law;

17       (d)   awarding Plaintiff its attorneys' fees, costs, and other expenses incurred

18   in this action; and

19       (e)   awarding Plaintiff such other and further relief as the Court deems just

20   and proper.

21

22

23

24

25

26

27

28

FIRST AMENDED COMPLAINT

3528605.1

1

## **JURY TRIAL DEMAND**

2

Plaintiff demands a trial by jury of all issues so triable.

3

4

Respectfully submitted,

5

DATED:  July 20, 2020

6

FRIEDMAN KAPLAN SEILER
  & ADELMAN LLP

7

8

s/ Edward A. Friedman
Edward A. Friedman
(efriedman@fklaw.com)
Robert J. Lack
(rlack@fklaw.com)
7 Times Square
New York, NY 10036-6516
(212) 833-1100

9

10

11

12

13

14

*Attorneys for Plaintiff Wilmington Savings
Fund Society, FSB, as successor indenture
trustee*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

51

FIRST AMENDED COMPLAINT

3528605.1